**DORCHESTER INVESTORS, Individually and On Behalf of All Others Similarly Situated, Plaintiff,**

**v.**

**PEAK INTERNATIONAL LIMITED, Peak Trends Trust, Luckygold 18A Limited, Jerry Mo, T.L. Li and Donaldson, Lufkin & Jenrette Securities Corporation, Defendants.**

**No. 99 Civ. 4696(LMM).**

United States District Court, S.D. New York.

March 27, 2001.

James Kreissman, Simpson Thacher & Bart, New York City, for plaintiff.

Paul D. Young, Milberg Weiss Bershad Hynes & Lerach, New York City, for defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

The present case is a class action lawsuit arising out of the initial public offering and sale of Trust Enhanced Dividend Securities ("TrENDS") by Peak TrENDS Trust. According to Plaintiffs, the TrENDS offering violated the federal securities laws because the accompanying registration statement and prospectus were materially false or misleading. Defendants move to dismiss the First Amended Complaint ("Complaint") on the grounds that Plaintiffs fail to state a cause of action under the securities laws. For the reasons stated below, Defendants' motion is denied in part and granted in part.

## PARTIES [1]

Plaintiffs are a certified class of investors that purchased TrENDS pursuant to the allegedly false and misleading registration statement and prospectus issued in connection with the TrENDS offering.[2]

Peak TrENDS Trust ("Trust") is registered under the Investment Company Act of 1940 as a non-diversified, closed-end management investment company. Pursuant to the TrENDS Prospectus, the Trust offered 5.3 million TrENDS at a purchase price of $15.75 per unit. Donaldson, Lufkin & Jenrette Securities Corporation

("DLJ") was the lead underwriter for the TrENDS offering.

Luckygold 18A Limited ("Luckygold") is a British Virgin Islands corporation that owns 7,888,038 shares of Peak International Limited ("Peak")common stock.[3] T.L. Li ("Li") was the Chairman of the Board and Chief Executive Officer of Peak, Chairman of the Board of QPL Holdings Group and the sole shareholder of Luckygold.

## FACTS

On June 3, 1998 Peak TrENDS Trust, Luckygold and Peak, though DLJ, "participated in, conducted and completed the sale of" 5,300,000 TrENDS exchangeable for an equal amount of the common stock of Peak. (Compl.¶ 13.) In connection with the sale of TrENDS, on May 29, 1998, the Trust filed with the SEC the Peak TrENDS Registration Statement and Prospectus (collectively referred to herein as the "TrENDS Prospectus"). Attached to the TrENDS Prospectus was the Peak Share Offering Registration Statement and Prospectus (collectively referred to herein as the "Peak Share Offering Prospectus") (Compl.¶ 13.).

Peak TrENDS are debt securities linked to Peak common stock. (Compl.¶ 14.) The TrENDS are the "functional equivalent" of convertible securities because on May 15, 2001 the TrENDS are to be exchanged for shares of Peak common stock

---

**1.** The identity of the parties, as well as the relevant facts set forth herein, are taken from Plaintiffs' Complaint, and appropriately accepted as true for purposes of resolving this motion.

**2.** Dorchester Investors, Stanley Benerofe, Jeffrey Blaine, Steven Stone, Carole Stone, Bret Lambert, Mr. Weiser & Co. Retirement Plan & Trust and Helene Sterman were appointed Lead Plaintiffs by this Court on November 17, 1999.

**3.** Peak is also a British Virgin Islands corporation that "supplies precision engineered packaging products for the storage, transportation and automated handling of semiconductor devices and other electronic components." (Compl.¶ 4.) By stipulation of the parties dated June 2, 2000, Peak and Jerry Mo were dismissed from this case with prejudice.

or cash, depending on the performance of Peak common stock. (*Id.* ¶¶ 14–15.) Thus, the performance of Peak common stock directly impacts the value of the TrENDS.

Plaintiffs allege that the TrENDS were sold pursuant to a materially false and misleading prospectus. Plaintiffs assert that the TrENDS Prospectus either failed to disclose, or affirmatively misstated facts surrounding the true structure of the TrENDS offering, and contained misrepresentations regarding who was bearing the costs associated with the transaction.[4]

According to the Complaint, DLJ "discovered, immediately prior to the Peak TrENDS Offering when it first attempted to market Peak TrENDS, the only investors who were willing to purchase Peak TrENDS were hedge fund investors who had the cash to arbitrage their positions, i.e., buy Peak TrENDS and simultaneously sell short the underlying Peak common stock." (Compl. ¶ 17(i).) Moreover, it is asserted that the DLJ investors in the TrENDS "were willing to purchase Peak TrENDS *provided only* that they were afforded the opportunity to sell shares of Peak stock short in amounts equal to their Peak TrENDS purchases." *Id.* (emphasis in original).

In order to accommodate the hedge investors, Defendant Li loaned 1.7 million shares of Peak common stock to DLJ ("Borrowed Shares") pursuant to a Share Loan Agreement. (Compl. ¶ 17(ii).) The Borrowed Shares were required because there was an insufficient amount of Peak common stock in the market to satisfy the short-selling requirements of the large number of hedge investors necessary to initiate a market for the TrENDS. (*Id.*) Plaintiffs argue that Defendants violated the federal securities laws by failing to adequately disclose that the 1.7 million shares of Peak common stock would be immediately loaned to DLJ investors to facilitate the hedge strategy. (*Id.* ¶¶ 17(ii)–17(iv).) Further, Plaintiffs claim that Defendants wrongfully failed to disclose the risks associated with the hedge strategy. (*Id.* ¶ 20.)

The TrENDS Prospectus stated:

In connection with the offering of the TrENDS, Luckygold and Donaldson, Lufkin & Jenrette Securities Corporation intend to enter into a securities loan agreement (the "Securities Loan Agreement") on or prior to the closing of the offering of the TrENDS, which is anticipated to provide that, subject to certain restrictions, Donaldson, Lufkin & Jenrette Securities Corporation may from time to time borrow, return and reborrow Shares (the "Borrowed Shares") from Luckygold. The number of Borrowed Shares borrowed under the Securities Loan Agreement at any time is not expected to exceed 1,793,038 Borrowed Shares. In addition, in the course of ordinary trading or market-making activities, Donaldson, Lufkin & Jenrette Securities Corporation intends to lend to third parties Borrowed Shares borrowed from Luckygold. It is anticipated that such third parties may offer for sale such Borrowed Shares directly to one or more purchasers at negotiated prices, at market prices prevailing at the time of sale or at prices related to such market prices.

---

4. The Peak TrENDS Prospectus stated that the Trust will not bear any fees or expenses, and therefore will not pass these expenses on to the investors. Rather, the TrENDS Prospectus indicated that the costs will be paid by Luckygold and Li. Plaintiffs contend these representations to be false because the F–20 filed by Peak with the SEC on September 23, 1999 shows that the costs of the TrENDS offering were charged to Peak and categorized as a loan to Li.

(Kreissman Aff. Ex. A at 31.) The TrENDS Prospectus also disclosed that:

> The trading prices of the TrENDS in the secondary market will be directly affected by the trading prices of the Common Stock in the secondary market. Trading prices of Common Stock will be influenced by the Company's operating results and prospects and by economic, financial and other factors and market conditions.

(*Id.* at 7.) With respect to these two paragraphs of the TrENDS Prospectus, Plaintiffs find fault with the phrase "in the course of ordinary trading or market-making activities," the use of the word "may" and the failure to disclose the risk of market destabilization caused by the influx of a large number of short sales. (Compl.¶¶ 26–29.)

Plaintiffs contend that because a large number of shares would need to be hedged against the TrENDS, such activity cannot reasonably be considered as taking place in the course of "ordinary trading or market-making activities." (*Id.* ¶ 26(i).) Moreover, the use of the word "may" suggests that the borrowing of shares was a mere possibility, "when, in fact, defendants had always intended to make the Borrowed Shares available to selected purchasers of the TrENDS so that these selected investors could hedge their TrENDS positions with the sale of Peak stock." (*Id.* ¶ 26(ii).) More specifically, Plaintiffs argue that Defendants were required to disclose that the short sales were a "foregone conclusion" because DLJ would not have been able to initiate a market for TrENDS without them. (*Id.*) Plaintiffs also contend that pursuant to Item 303 of Regulation S–K of the Securities Act of 1933, "defendants were required to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way." (*Id.* (citing 17 C.F.R. § 229.303)).

Plaintiffs also allege securities laws violations under the Peak Share Offering Prospectus. Many of the same disclosure statements, or lack thereof, were also contained in the Peak Share Offering Prospectus which was attached to the TrENDS Prospectus sent to investors. Despite the physical attachment to the TrENDS Prospectus when sent to investors, the Peak Share Offering Prospectus was not filed with the SEC as part of the TrENDS offering, and the TrENDS Prospectus explicitly did not incorporate the Peak Share Offering Prospectus by reference.

Plaintiffs make the same allegations as described above regarding the inadequate disclosure of the hedge strategy, as well as alleging that the Peak Share Offering Prospectus was "materially false and misleading because it contained false financial statements which reflected artificially inflated sales and revenues figures." (Compl.¶ 22.) In addition, Plaintiffs allege that the Peak Share Offering Prospectus was false and or misleading because it included "extraordinary sales in the quarter immediately preceding the Peak TrENDS offering but failed to disclose that these sales were made in non-arms length transactions to affiliated third-parties owned and controlled by defendant Li, especially to QPL Holdings Group ("QPL") which was, and is, 40% owned by defendant Li." (Compl.¶ 41.)

After the TrENDS offering and the hedge strategy commenced, the common stock of Peak declined substantially. Similarly, the price of the TrENDS, which were offered for approximately $15.75, declined to less than $4.00 within one year of the TrENDS offering. (Compl.¶ 19.) The present litigation ensued.

## LEGAL STANDARD

Under Rule 12(b)(6) a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). A court should dismiss a complaint only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## DISCUSSION

Plaintiffs' Complaint seeks relief pursuant to three sections of the Securities Act of 1933 ("Securities Act"), and one claim for relief under the Investment Company Act of 1940. Defendants have asserted multiple arguments in support of their motion to dismiss the Complaint in its entirety. Each of Plaintiffs' causes of action will be addressed in turn.

### A. Section 11

■ Plaintiffs' first cause of action is brought pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, against all Defendants. Section 11 provides for damages sustained as a result of a false or misleading registration statement. If the registration statement contained an "untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," then "any person acquiring such security" may sue any of the entities or individuals identified in 15 U.S.C. §§ 77k(a)(1)-(5). More specifically, acquirers of the security may sue:

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

*Id.* Plaintiffs need not show intent or scienter in order to maintain a viable cause of action under Section 11.

An action under this Section must be commenced within one year after the discovery of the untrue statement or omission, or "after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. However, no action under Section 11 may be brought more than three years after the security was offered to the public. *Id.*

Defendants Luckygold and Li move to dismiss Plaintiffs' Section 11 claims against them on the grounds that neither Luckygold nor Li signed the registration statement. All Defendants move to dismiss Plaintiffs' claims under Section 11 on the

grounds that such an action is barred by the one year statute of limitations, and on the grounds that there are no material misstatements or omissions in the registration statement.

## 1.

■ The Court first considers Defendants Luckygold and Li's motion to dismiss Plaintiffs' Section 11 claims against them on the grounds that neither Luckygold nor Li signed the TrENDS registration statement. That motion is granted.

As noted above, Section 11 explicitly enumerates the individuals upon which civil liabilities may be imposed on account of a false registration statement. Defendants Li and Luckygold do not fit into any of the five categories of persons. Rather than contend they do, Plaintiffs seek to impose liability under Section 11 as to Li and Luckygold on the basis of the Peak Share Offering Prospectus because the Peak Share Offering Prospectus was signed by Li and allegedly contained other actionable misstatements or omissions. Plaintiffs argue that the Peak Share Offering Prospectus is a part of, or should be deemed incorporated into, the TrENDS offering materials thereby giving Plaintiffs standing to sue upon statements therein. In support of this position, Plaintiffs argue that the Peak Share Offering Prospectus was physically attached to the TrENDS offering materials sent out to investors and should be deemed incorporated by necessity because it included "essential" financial information about Peak that was necessary for investors considering whether to invest in TrENDS. This argument is untenable as a matter of fact and law.

As a matter of fact, the TrENDS Prospectus addressed the attached Peak Share Offering Prospectus in bold capital letters on page five:

Reference is made to the accompanying prospectus of the Company [Peak] with respect to the shares of Common Stock which may be received by a Holder of TrENDS on the Exchange Date or upon earlier dissolution of the Trust. **THE COMPANY PROSPECTUS IS BEING ATTACHED HERETO AND DELIVERED TO PROSPECTIVE PURCHASERS OF THE TrENDS TOGETHER WITH THIS PROSPECTUS FOR CONVENIENCE OF REFERENCE ONLY. THE COMPANY PROSPECTUS DOES NOT CONSTITUTE A PART OF THIS PROSPECTUS, NOR IS IT INCORPORATED BY REFERENCE HEREIN.**

(Kreissman Aff. Ex. A at 5 (emphasis in original).) Similarly, the Share Offering Prospectus, on page one, states:

The TrENDS are offered (the "Offering") by a separate prospectus of the Trust (the "Trust Prospectus"). This Prospectus of the Company relates only to the Shares covered hereby and does not relate to the TrENDS. **THE COMPANY TAKES NO RESPONSIBILITY FOR ANY INFORMATION INCLUDED IN OR OMITTED FROM THE TRUST PROSPECTUS. THE TRUST PROSPECTUS DOES NOT CONSTITUTE A PART OF THIS PROSPECTUS, NOR IS IT INCORPORATED BY REFERENCE HEREIN.**

(Kreissman Aff. Ex. B at 1 (emphasis in original).) The two documents could not more clearly express an intention to not incorporate each other by reference.

As a matter of law, the Court finds persuasive the reasoning of *Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F.Supp. 1265, 1286 (S.D.N.Y.1992) and *In re Bank of Boston Corp. Securities Litigation*, 762 F.Supp. 1525, 1538–39 (D.Mass.1991). Those cases identified by the parties, although not binding precedent, rejected claims based upon alleged misstatements or omissions that were not specifically incorporated into

the registration statement or prospectus at issue. *See, e.g., In re Bank of Boston Corp. Sec. Litig.,* 762 F.Supp. at 1538–39 (granting defendants' motion for summary judgment where the registration statement explicitly incorporated some, not all, documents at issue because "none of the alleged misleading documents or public statements [were] explicitly incorporated in the Registration Statement and Prospectus"). Here, the TrENDS Prospectus explicitly stated that it did not incorporate the Peak Share Offering Prospectus. Thus, the Court finds no support for Plaintiffs' incorporation by necessity argument.

Therefore, because Luckygold and Li do not fall within the enumerated categories of persons who can be sued under Section 11, and because the Court rejects Plaintiffs' argument for basing liability on the Peak Share Offering Prospectus, Plaintiffs' Section 11 claims against these Defendants are dismissed with prejudice.[5]

### 2.

The Court next considers the motion by all Defendants[6] to dismiss Plaintiffs' Section 11 claims on the ground that any such claim is barred by the one year statute of limitations. That motion is granted subject to renewal.

As stated above, any action under Section 11 must be commenced within one year after the discovery of the untrue statement or omission, or "after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m; *see also In re Dreyfus Aggressive Growth Mutual Fund Litig.,* No. 98 Civ. 4318, 2000 WL 10211 (S.D.N.Y. Jan.6,

2000). In no case may a Section 11 claim be brought more than three years after the sale of the securities.

In connection with a suit under the Securities Act, a plaintiff is deemed to have constructive or inquiry notice when the misrepresentation or omission "reasonably should have been discovered." *In Re Dreyfus Aggressive Growth Mutual Fund Litig.,* at \*3 (citing *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.,* 941 F.Supp. 1369, 1374 (S.D.N.Y.1996)). Such a reasonable discovery occurs "when all the facts and circumstances would alert 'a person of ordinary intelligence to the probability that he has been defrauded.'" *Sloane Overseas Fund,* 941 F.Supp. at 1374 (quoting *In re Ames Dep't Stores, Inc.,* 991 F.2d 968, 979 (2d Cir.1993)). "At that point, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such inquiry" and the statutory time period in which to commence a lawsuit will begin to run. *In re Dreyfus,* 2000 WL 10211, at \*3 (citing *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.1993)). Although the Second Circuit has determined that the test as to when fraud should have been discovered may be resolved as a matter of law, *Dodds,* 12 F.3d at 350, "on a motion to dismiss, not every case will be susceptible to such a determination." *Vassilatos v. Ceram Tech. Int'l Ltd.,* No. 92 Civ. 4574, 1993 WL 177780, at \*4 (S.D.N.Y. May 19, 1993).

Defendants argue that Plaintiffs' claims are time barred because Plaintiffs should have discovered the alleged fraud by June 15, 1998, over one year prior to

---

**5.** Implicit in this holding is that Plaintiffs have no cause of action on the basis of either the financial information allegedly not in compliance with Generally Accepted Accounting Principles, or the allegedly misleading information concerning transactions with QPL,

contained in the Peak Share Offering Prospectus.

**6.** Having dismissed Luckygold and Li from any Section 11 liability, the only Defendants remaining potentially liable for Section 11 violations are DLJ and the Trust.

filing the Complaint. Defendants contend that "[t]he TrENDS Prospectus disclosed the Share Loan Agreement, explained how DLJ would loan the borrowed shares to third parties, and notified investors that those third parties would then offer the borrowed shares for sale to others." (Defs.' Reply Mem. at 26.) Moreover, Defendants rely on a June 15, 1998 Bloomberg report (Pls. Mem. Opp'n Ex. D) showing a "jump in the short sales of Peak common stock" commensurate with the number of shares loaned to DLJ under the Share Loan Agreement as well as the sharp decline in the value of Peak common stock. (Defs.' Reply Mem. at 26–27.) Defendants conclude that "[t]aken together, this information alerted investors to the possibility that the Share Loan Agreement was permitting extensive short-selling of Peak common stock, and thus placed them on constructive notice of the 'undisclosed hedge plan' alleged in the Amended Complaint." (*Id.* (citing Compl. ¶ 24).)

Plaintiffs contend that they were "first able to begin investigating the claims made in the Complaint on or about November 1, 1998, when it received correspondence from Peak President Richard Brook alerting it to improprieties at Peak which were then discussed during a meeting with Mr. Richard Brook." (Pls.' Mem. at 30.) In addition, Plaintiffs argue that the June 15, 1998 Bloomberg financial report is insufficient to charge them with inquiry notice. Thus, they conclude that the Complaint would have been timely if filed anytime on or before November 1, 1999.

Defendants are correct in asserting that Plaintiffs are deemed to be on notice of facts giving rise to a fraud claim that are in the public domain. *See, e.g., Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026,

1999 WL 301691,*4 (S.D.N.Y. May 12, 1999) (citing *Berry Petroleum Co. v. Adams and Peck*, 518 F.2d 402, 410 (2d Cir.1975)). However, Plaintiffs are similarly correct in asserting that not all news articles and reports are sufficient to put prospective plaintiffs on notice and start the statute of limitations running. *See In re Ames Dep't Stores, Inc.*, 991 F.2d 968 (2d Cir.1993) (reversing a grant of summary judgment on statute of limitations grounds despite approximately fifteen news reports or articles presenting facts relevant, but more simplistic, than the facts forming the basis of the fraud claim).

Here, the facts are such that the Court cannot determine as a matter of law whether disclosures in the TrENDS Prospectus, the Share Loan Agreement, the decline in market value of Peak common stock and the Bloomberg report [7] are sufficient to find that Plaintiffs' claims are time barred. Accordingly, the Court finds that the issue of whether Plaintiffs were on inquiry notice, and thus whether their claims are barred by the statute of limitations, is a factual one to be resolved by the trier of fact. *See In re Dreyfus*, 2000 WL 10211, at *3 ("[T]he issue of constructive knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage in this litigation."); *Dietrich v. Bauer*, 76 F.Supp.2d 312, 345 (S.D.N.Y. 1999) ("[T]he question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide.").

However, as a corollary to their statute of limitations argument, Defendants contend that the factual allegations regarding the discovery of the misstatements or omissions in the complaint are insufficient. *In re Chaus Sec. Litig.*, No. 88 Civ. 8641,

---

7. The Court notes, however, that unlike any case pointed to by Defendants, the Bloomberg article in this case is not an article at all, but rather a small chart of financial information.

More specifically, unlike a typical article which a reader can review and discern facts hinting at fraud, the chart in this case, standing alone, would be insufficient to do so.

1990 WL 188921 (S.D.N.Y. Nov.20, 1990). Defendants correctly indicate that Plaintiffs' Complaint is deficient because it fails to set forth the time and circumstances of the discovery of the statement, the reasons why it was not discovered earlier, and the efforts undertaken by Plaintiffs in making or seeking such discovery. *Id.* at *2. However, the Court finds that Plaintiffs can amend their Complaint asserting the facts alleged in their opposition papers to survive the pleading standard of *In re Chaus.*

Therefore, Defendants' motion to dismiss Plaintiffs' Section 11 claims on the grounds that they are barred by the one year statute of limitations is granted, subject to renewal if Plaintiffs properly amend the Complaint within 45 days of the date of this Memorandum and Order.

### 3.

Because the Court finds that Plaintiffs may amend the Complaint to survive the statute of limitations argument, the Court considers all Defendants' motion to dismiss Plaintiffs' Section 11 claims on the basis that Plaintiffs fail to show any material misrepresentations or omissions in the TrENDS offering materials. Based on the alleged facts regarding the underlying TrENDS offering, and the text of the TrENDS Prospectus, Defendants' motion is denied.

■ To set forth a prima facie claim under Section 11, a plaintiff must allege that "[a] part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *see also Olkey v. Hyperion 1999 Term Trust Inc.,* 98 F.3d 2, 5 (2d Cir.1996) (holding that the critical issue is whether defendants' representations taken together, and in context, would have misled a reasonable investor); *Rapoport v. Asia Elecs. Holding Co.,* 88 F.Supp.2d 179, 183 (S.D.N.Y.2000).

Here, in moving to dismiss Plaintiffs' Complaint, Defendants contend that the TrENDS Prospectus contains all the necessary material disclosures, and is in no way misleading. Plaintiffs contend that the disclosures, when considered as a whole, and in the appropriate context, are misleading.[8] As set forth above, the TrENDS Prospectus, in connection with the Share Loan Agreement, stated that DLJ "may from time to time borrow" the shares loaned by Luckygold. (Kreissman Aff. Ex. A, 31.) In addition, the Prospectus stated that DLJ, in the course of market-making activities, intends to lend the Borrowed Shares to third parties and anticipates that the third parties "may offer for sale such Borrowed Shares." (*Id.*)

Plaintiffs contend, inter alia, that such statements are misleading because the hedge strategy requiring the short selling activity was characterized only as a possibility when in fact it was a forgone conclusion.[9] (Pls.' Mem. at 23–28.) Specifically,

---

**8.** As discussed above, the Court rejects Plaintiffs' position that misstatements or omissions in the Peak Share Offering Prospectus, attached to the TrENDS Prospectus, are actionable, and need not consider whether any such statements or omissions are misleading.

**9.** Plaintiffs' other allegations with respect to Defendants' material omissions and misleading statements include using the word "borrow" instead of short sell, omitting that the market for TrENDS could not exist without the short selling arrangement, classifying the borrowing activity as "ordinary market-making activities" and failing to state that the offer to short sell Peak common stock was only open to DLJ investors.

Plaintiffs argue that because the short selling was guaranteed to occur, using the word "may" is misleading.[10] Defendants contend that the federal securities laws do not require classifying or commenting on the objective facts. *See, e.g., Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 5–6 (2d Cir.1983) ("The disclosure required by the [Securities] Act is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters."). Accordingly, Defendants argue that they satisfied their disclosure obligation by disclosing the possibility that such short selling could occur, so that a reasonable and prudent investor was not misled as to the nature of the TrENDS offering and short sale hedging.

Defendants rely heavily on *In re Cendant Corp. Litig.,* 60 F.Supp.2d 354 (D.N.J.1999) for the proposition that using the word "may" is "highly suggestive and put[s] the public on notice." *Id.* at 376. Moreover, the court in *Cendant* indicated that using the word "may" when the outcome is certain is sufficient disclosure. *Id.* On the other hand, Plaintiffs rely on the Second Circuit's opinion in *Hunt, IRA v. Alliance N.A. Gov't Income Trust, Inc.,* 159 F.3d 723 (2d Cir.1998), sustaining a fraud claim where the prospectus indicated the company would attempt to engage in hedge investing that was not possible under the circumstances.

The Court finds that the reasoning of the Second Circuit in *Hunt* controls in this case. In *Hunt,* the Second Circuit specifically held that stating an outcome as a possibility, that in fact is not a possibility, is misleading. This case presents a rather straightforward application of the Court's logic in *Hunt.* Stating that the borrowing of shares may occur,[11] when in fact it is certain to occur, is misleading.

However, for Plaintiffs to prevail on this claim, Plaintiffs must demonstrate that Defendants were *certain* such a result would occur. If Plaintiffs can show that Defendants knew in advance that the short selling of a substantial number of shares of Peak common stock would in fact commence immediately in connection with the TrENDS offering, then the TrENDS Prospectus is misleading. On the other hand, if Defendants can show that such borrowing was less than certain, the TrENDS Prospectus cannot be found misleading as a matter of law. At this stage of the litigation such a determination cannot be made—discovery is required. Accordingly, Defendants' motion to dismiss Plaintiffs' Section 11 claims on this basis is denied.

### B. Section 12

■ All Defendants move to dismiss Plaintiffs' Section 12 claims on the grounds that Plaintiffs fail to show any material misrepresentations or omissions in the TrENDS offering materials. In addition, Defendant Li moves to dismiss Plaintiffs' Section 12 claims against him on the basis

---

10. Plaintiffs also contend that the disclosure statements, and the timing thereof, regarding whether Li was bearing the costs of the TrENDS offering are misleading. Defendants move to dismiss this claim on the grounds that the disclosures were sufficiently delineated to render them immaterial. Defendants' motion in so far as it is based on this argument is denied because whether the disclosures and the timing thereof are material, "requires [a] delicate assessment[] of the in- ferences a 'reasonable shareholder' would draw from [the facts]" appropriate for the trier of fact. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

11. The Court does not need to reach the question of whether using the phrase borrowing rather than short selling constitutes sufficient disclosure, or is itself misleading.

that he is not an offeror, solicitor or seller within the scope of Section 12.

**1.**

The issue of whether the TrENDS materials contain misrepresentations or omissions has been fully addressed, and for the reasons stated above, Defendants' motion to dismiss is denied because Plaintiffs may be able to show that the TrENDS Prospectus was misleading.

**2.**

■ As to Defendant Li, the Court must determine whether Plaintiffs' have alleged facts sufficient to maintain a Section 12 cause of action. For the reasons set forth below, the Court finds that both the Complaint and Plaintiffs' opposition papers fail in this regard, and grants Defendant Li's motion to dismiss Plaintiffs' Section 12 claims against him.[12]

Section 12(a)(2) of the Securities Act imposes liability on a person who sells or offers a security pursuant to a false or misleading prospectus. 15 U.S.C. § 77l(a)(2). The United States Supreme Court, in *Pinter v. Dahl*, 486 U.S. 622, 643, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), determined that one can be subjected to liability under this Section only if he passes title or "solicits the purchase, motivated at least in part by a desire to serve his own financial interests." [13] *Pinter*, 486 U.S. at 647, 108 S.Ct. 2063.

Here, because Li never had title to the TrENDS, or any other interest in the TrENDS, he cannot be found to be a seller of TrENDS. Therefore, for Plaintiffs'

claim under Section 12(a)(2) to be viable against Li, Plaintiffs must allege that Li solicited the sale of TrENDS for his own financial benefit. *See Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 48–50 (2d Cir.1991). However, Plaintiffs fail to satisfy this burden.

Plaintiffs fail to allege that Li undertook any activities designed to solicit the sale of TrENDS. Plaintiffs assert that Li's name appears frequently in the Prospectus, and that Li is identified as a person upon whom the success of Peak depends. (Pls.' Mem. at 33.) However, these allegations are insufficient because they do not demonstrate that Li solicited the sale of TrENDS. Moreover, the naked conclusion that "Li completed the sale of over $80 million worth of TrENDS without disclosing the true material facts surrounding that Offering, thus enabling Li to repay the majority of his $55 million debt to DLJ without losing voting control over the Peak stock pledged to the Peak TrENDS Trust" (Compl. ¶ 16) is insufficient to satisfy the pleading requirement of Section 12(a)(2). Plaintiffs' Section 12(a)(2) claim is dismissed as to Defendant Li.

**C.  Section 15**

■ Defendant Li moves to dismiss Plaintiffs' claims under Section 15 of the Securities Act on the grounds that Plaintiffs fail to adequately allege an underlying violation of either Section 11 or Section 12 of the Securities Act. Alternatively, Li moves to dismiss the Section 15 claims on the grounds that Plaintiffs have failed to

---

**12.** The Court addresses the statements contained in Plaintiffs brief so that if Plaintiffs amend their Complaint, such statements are not incorporated into the Complaint in the hopes that they are sufficient. That said, because the Court is requiring Plaintiffs to amend their Complaint regarding the statute of limitations, the Court will reconsider the seller issue if the amended complaint can

allege additional allegations regarding Li's role as a solicitor, offeror or seller.

**13.** The Court recognizes that *Pinter* was addressing claims brought under Section 12(a)(1) rather than 12(a)(2). However, as both parties indicate, because the language of the two Sections is identical, the *Pinter* analysis governs claims brought pursuant to 12(a)(2).

allege facts sufficient to find control person liability. Because the Court finds, as discussed above, that Plaintiffs adequately allege Section 12 violations against Luckygold, the Court only must consider whether the Complaint adequately alleges that Li is a control person in order to sustain Plaintiffs' Section 15 claim as to Li.

Section 15 of the Securities Act provides liability for every person who "controls any person liable" under §§ 11 and 12(a)(2). 15 U.S.C. § 77o. To establish a prima facie showing of control person liability, a plaintiff must plead "that the individual defendants each controlled a primary violator of the securities laws." *In re: APAC Teleservice, Inc. Sec. Litig.*, No. 97 Civ. 9145, 1999 WL 1052004, at *11 (S.D.N.Y. Nov. 19, 1999). "Adequately alleg[ing] underlying violations of the securities laws as well as the individual defendants' control" is sufficient to overcome a motion to dismiss. *Id.* at *12.

Under this standard, the Court holds that, the Complaint adequately alleges control person liability. The Complaint sets forth that Li is the Chairman of the Board and Chief Executive Officer of Peak, Chairman of the Board of QPL Holdings, and the sole shareholder of Luckygold. There can be no dispute that as Chairman of Peak, and as the sole shareholder of Luckygold, Li had some degree of control over the activities of the various Peak entities and Luckygold. Therefore, the Court denies Li's motion to dismiss Plaintiffs' Section 15 claim.

## D. Section 34(b) of the Investment Company Act of 1940

■ Plaintiffs' Complaint asserts a cause of action against the Trust under Section 34(b) of the Investment Company Act of 1940 ("ICA"). 15 U.S.C. § 80a–33(b). The Trust moves to dismiss this claim on the grounds that there is no private right of action under Section 34(b). The Court agrees.

Surprisingly, neither the United States Supreme Court nor any circuit court of appeals has addressed the issue of whether the ICA provides for a private right of action under Section 34(b). Plaintiffs rely on *In re Nuveen Fund Litig.*, No. 94 C 360, 1996 WL 328006 (N.D.Ill. June 11, 1996), and a liberal interpretation of *Fogel v. Chestnutt*, 668 F.2d 100, 110–11 (2d Cir.1981) and *Hunt, IRA v. Alliance N.A Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir.1998), in support of their argument that Section 34(b) permits a private right of action.

However, this Court is persuaded by the decision in *Olmsted v. Pruco Life Ins. Co. of New Jersey*, No. CV 00–1340, 2000 WL 1739307 (E.D.N.Y. Oct.30, 2000), where the court declined to find a private right of action under various provisions of the ICA. In *Olmsted*, Judge Garaufis held that "Congress did not intend to give investors a private right of action under [various other sections of the ICA]. To infer otherwise would encroach upon the powers of legislation reserved for Congress. This court will not graft onto [provisions of the ICA] a remedy which Congress did not intend to provide." *Id.* at *4.

This Court agrees with the analysis of *Olmsted* and declines to infer a private right of action under Section 34(b) of the ICA. Accordingly, the Trust's motion to dismiss Plaintiffs' fourth cause of action is granted.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' Section 11 claims are dismissed with leave to re-plead;[14] Plaintiffs' Section 12 claim

---

14. As stated above, Plaintiffs may submit an amended complaint within 45 days of the date

of this Memorandum and Order to cure the

against Defendant Li is dismissed with leave to replead; and Plaintiffs' Section 34(b) claim against the Trust is dismissed with prejudice. Defendants' motion is denied in all other respects.[15]

SO ORDERED.

statute of limitations pleading deficiencies discussed herein. As to Defendants Luckygold and Li, Plaintiffs' Section 11 claims are dismissed with prejudice.

15. All arguments not explicitly addressed herein have been fully considered by the Court.