COURT OF CHANCERY
OF THE
STATE OF DELAWARE

ANDRE G. BOUCHARD
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: September 15, 2017
Date Decided: December 22, 2017

Kurt M. Heyman, Esquire
Jamie L. Brown, Esquire
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

Kenneth J. Nachbar, Esquire
Kevin M. Coen, Esquire
Zi-Xiang Shen, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19801

RE:  ***Chatham Asset Management, LLC v. Papanier***
Civil Action No. 2017-0088-AGB

Dear Counsel:

This letter constitutes the Court's decision on defendants' motion to dismiss the Verified Amended Complaint filed on April 10, 2017.  For the reasons explained below, the motion is granted in part and denied in part.

## I.    Background

Unless otherwise noted, the facts recited in this letter decision come from the allegations in the Amended Complaint and documents incorporated therein.[1]  Any additional facts are either undisputed or subject to judicial notice.

---

[1] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (internal quotation marks and citations omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss.).

### A.    The Parties

Plaintiffs Chatham Asset Management, LLC, Chatham Fund, LP, and Chatham Asset High Yield Master Fund, Ltd. ("Chatham") hold common stock of Twin River Worldwide Holdings, Inc. ("Twin River"). Pursuant to a waiver granted by the Rhode Island Department of Business Regulation, Chatham is permitted to own up to, but not more than, 15% of Twin River's common stock.[2]

Defendants consist of six individuals who served at relevant times as directors or officers of Twin River. George Papanier, John E. Taylor, Jr., Soo Kim, and Stephen H. Capp served as directors. Papanier is Twin River's President and Chief Executive Officer; the other three individuals are outside directors. The remaining two individual defendants—Craig L. Eaton and Glenn Carlin—served as officers of Twin River.

Non-party Twin River conducts casino and other operations in Rhode Island, Mississippi, and Colorado through its subsidiaries. Twin River's stock does not trade on a national securities exchange but does trade on institutional trading desks, where only qualified institutional buyers are permitted to purchase shares.[3]  Quotes

---

[2] Am. Compl. ¶ 26.

[3] Am. Compl. ¶ 25. The term "qualified institutional buyer" means any of certain entities "acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity." 17 C.F.R. § 230.144A(a)(1)(i).

2

on the stock and trading activity are disseminated via Bloomberg. According to Chatham, "[a]s a result of this generally small trading community, the trading price of the stock reacts swiftly and significantly to any newly disclosed information that changes the balance of supply and demand."[4]

### B.    The Tender Offer

On November 15, 2016, when its stock was trading for approximately $70 per share, Twin River announced a tender offer to purchase up to 250,000 shares of its common stock for $80 per share in cash (the "Tender Offer").[5] Immediately after the Tender Offer was announced, Twin River's stock was quoted at $80 per share and "remained[ed] available at that price" until early April 2017 "for very small volume transactions."[6]

On December 16, 2016, Twin River announced that 1,738,293 shares were validly tendered and that it would purchase 14.38% of the shares tendered by each participating investor.[7] Chatham alleges that "despite having specifically increased Twin River's credit facility to allow the Company to purchase $50 million worth of

---

[4] Am. Compl. ¶ 25.

[5] Am. Compl. ¶ 27.

[6] Am. Compl. ¶ 27.

[7] Am. Compl. ¶ 31.

shares, only $20 million was used—a paltry sum compared to Twin River's approximately $780 million market capitalization."[8]

### C.     The Offer to Purchase

Twin River made the Tender Offer through an offer to purchase circular dated November 15, 2016 ("Offer to Purchase").  The Offer to Purchase stated that "[t]he purpose of the Offer is to return cash to our Shareholders by providing them the opportunity to tender all or a portion of their Shares and, thereby, receive a return of some or all of their investment if they so elect."[9]  The Offer to Purchase also stated that Twin River's directors and executive officers did not "currently intend" to participate in the Tender Offer but that they may sell their shares in the post-Tender Offer market "from time to time":

> Our directors, executive officers and affiliates may, subject to applicable law and applicable policies of the Company, sell their Shares from time to time pursuant to the terms of equity compensation awards or in open-market and/or other transactions at prices that may be more or less favorable than the Purchase Price to be paid to our Shareholders pursuant to the Offer.[10]

The Tender Offer expired on December 15, 2016.[11]

---

[8] Am. Compl. ¶ 8.

[9] Defs.' Opening Br. Ex. B at 2.

[10] *Id.* at 2, 16.

[11] Defs.' Opening Br. Ex. B.

### D.    Defendants' Alleged Plan to Sell Their Shares

Chatham alleges that when defendants made the Tender Offer, they planned to sell their shares, not "from time to time," but shortly after the Tender Offer closed.[12]  According to Chatham, "a representative of Defendants informed certain stockholders of Twin River (other than Chatham) that the Defendants had wanted to participate in the Tender Offer," but when they learned that it would be problematic for them to do so, they "quickly determined to sell their shares promptly after the Tender Offer closed."[13]

"Within weeks of the Tender Offer closing," defendants allegedly shopped "at least 125,000 shares, half of the total Twin River purchased through the Tender Offer, through at least one broker."[14]  According to Chatham, the broker provided "big-boy" letters to prospective purchasers to facilitate the sale of defendants' shares.[15]  The Amended Complaint, which was filed on April 10, 2017, does not allege that defendants actually sold any shares since the Tender Offer expired on

---

[12] Am. Compl. ¶ 3.

[13] Am. Compl. ¶ 4.

[14] Am. Compl. ¶ 5.

[15] *Id.*  "Big boy letters are agreements between parties to a securities transaction where one party, typically the seller, has material, nonpublic information that it does not want to disclose, but both parties want to complete the transaction and preclude any claims based on the nondisclosure."  Edwin D. Eshmoili, Note, *Big Boy Letters: Trading on Inside Information*, 94 CORNELL L. REV. 133, 135 (2008).

December 15, 2016. Defendants represented that they still had not done so as of June 9, 2017, when their reply brief was filed.[16]

Before the Tender Offer closed, Chatham owned 14.98% of Twin River's stock.[17] Chatham alleges it had "no choice" but to tender some of its shares into the Tender Offer because of the 15% cap on its holdings, which it did.[18] As a result, Chatham held a 14.91% position in Twin River after the Tender Offer closed.[19] In the months after the Tender Offer closed, Twin River stock traded between approximately $80 and $82 per share.[20]

### E. Twin River Sends a Letter to Rhode Island Regulators Concerning Chatham

Twin River is party to a Regulatory Agreement, dated July 1, 2016, with the Rhode Island Department of Business Regulation and the Division of Lotteries of the Rhode Island Department of Revenue (the "Regulators"). The Regulatory Agreement contains a provision obligating Twin River to comply with, and to cause owners of 5% or more of its stock to comply with, certain legal requirements:

---

[16] Defs.' Reply Br. 1-2.

[17] Am. Compl. ¶ 26.

[18] Am. Compl. ¶¶ 30, 57.

[19] Am. Compl. ¶ 26.

[20] Am. Compl. ¶ 32.

> [Twin River] shall at all times comply and remain in compliance with and shall cause its Senior Executives, directors and owners of a direct or indirect Financial Interest of 5% or greater in any class of Financial Interests in each Rhode Island Company to comply and remain in compliance with: (i) all applicable requirements under all laws, statutes and rules and regulations; (ii) this Agreement; (iii) the VLT Contract; (iv) the Newport VLT Contract; and (v) all applicable decrees and orders of any Governmental Authority.[21]

According to defendants, Twin River could face various penalties if it fails to comply with its obligations under the Regulatory Agreement.[22]

On April 7, 2017, Twin River sent a letter to the Regulators (the "April 7 Letter") bringing to their attention certain "recent events involving Chatham."[23] The April 7 Letter stated that these events called into question whether Chatham was in compliance with its institutional shareholder license, which "requires that institutional investors have (1) no involvement in the Company's business activities and (2) no intention of influencing, affecting or participating in the Company's affairs."[24] The April 7 Letter identified four such events: the frequency

---

[21] Defs.' Opening Br. Ex. E § 7.1. The Court takes judicial notice of the Regulatory Agreement because there can be no reasonable dispute concerning its existence and contents. *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[22] According to defendants, those penalties could include "injunctive relief, withholding of income, monetary penalties of up to $50,000 per violation[,] and any other remedies that the regulators have at law or equity" and "the revocation or suspension of its gaming license." Def. Opening Br. 19 n.12.

[23] Defs.' Opening Br. Ex. A at 1.

[24] *Id.*

of Chatham's contacts with Twin River, the fact that Chatham representatives expressed a desire for "immediate liquidity" for their investment in Twin River in June 2016, the filing of this lawsuit in February 2017, and an investor call that occurred on April 4, 2017.[25]

The April 7 Letter, a copy of which was sent to Chatham's counsel, also stated that Twin River "necessarily cannot be sure of all potentially relevant information because some of it is not available to us and in some respects Chatham's subjective intent may be relevant."[26] Chatham contends that defendants submitted the April 7 Letter to "retaliate[] against Chatham for seeking to protect [its] rights via this lawsuit."[27]

## II. Procedural Posture

On February 6, 2017, Chatham filed its original complaint, which it amended on April 10, 2017. The Amended Complaint asserts three claims, each of which Chatham has brought individually. None of the claims is asserted derivatively or on behalf of a putative class.

On April 25, 2017, defendants moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.

---

[25] *Id.* at 1-2.

[26] *Id.*

Argument on the motion was held on August 8, 2017, and the parties filed supplemental briefs on September 15, 2017.

## III.    Analysis

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[28]

Although this standard is minimal, the Court "will not credit conclusory allegations or draw unreasonable inferences in favor of the Plaintiffs,"[29] nor will it "accept every strained interpretation of the allegations proposed by the Plaintiff."[30]

### A.    Count I States a Claim for Relief

In Count I of the Amended Complaint, Chatham asserts that the four director defendants (Papanier, Taylor, Kim, and Capp) breached their fiduciary duties by making materially false and misleading statements in the Offer to Purchase.

---

[27] Am. Compl. ¶ 15.

[28] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotation marks and citation omitted).

[29] *In re BJ's Wholesale Club, Inc. S'holder Litig.*, 2013 WL 396202, at *5 (Del. Ch. 2013).

"[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[31]  A fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[32] Stated differently, material facts are those that, if disclosed, would "significantly alter[] the 'total mix' of information made available."[33]

The gravamen of Chatham's disclosure claim is that the Offer to Purchase was false or misleading because it stated that "the purpose of the Tender Offer was 'to return cash to [Twin River's] shareholders'" and that Twin River's directors and executive officers "may . . . sell their shares from time to time" after the Tender Offer closed when, in reality, their true intent was to use the Tender Offer "to increase the price of the stock" and to sell "at or near this increased price" "shortly after the Tender Offer closed."[34]  In support of this contention, Chatham alleges as follows:

---

[30] *Gen. Motors*, 897 A.2d at 168 (internal quotation marks and citation omitted).

[31] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[32] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[33] *Id.*

[34] Am. Compl. ¶¶ 2-3, 6, 51.

. . . a representative of Defendants informed certain stockholders of Twin River (other than Chatham) that the Defendants had wanted to participate in the Tender Offer so that they could, among other reasons, raise funds to pay down loans on encumbered Twin River shares and/or to pay taxes owed on their exercise of Twin River holdings. When the Defendants were informed prior to the Tender Offer that it would be problematic for them to sell shares in the Tender Offer, the Defendants quickly determined to sell their shares promptly after the Tender Offer closed.

. . . Within weeks of the Tender Offer closing, the Defendants, consistent with their scheme, started shopping at least 125,000 shares, half of the total Twin River purchased through the Tender Offer, through at least one broker. In fact, the broker provided "big boy" letters to prospective purchasers in order to facilitate the sale of Defendants' shares.[35]

Accepting these allegations as true and drawing all reasonable inferences in Chatham's favor, as I must at the pleadings stage, it is reasonably conceivable that the director defendants breached their fiduciary duties in connection with the disclosures discussed above. The specific factual allegations concerning the efforts defendants made to sell a substantial number of their shares "shortly" after the Tender Offer closed cast reasonable doubt on the veracity of the noncommittal disclosure in the Offer to Purchase that they "may . . . sell their shares from time to

---

[35] Am. Compl. ¶¶ 4-5.

time." As one federal court put it, "stating an outcome as a possibility, that in fact is not a possibility, is misleading."[36]

The existence of a firm intention by defendants to sell their shares, if true, also would appear to be material. Defendants concede as much: "If Twin River stated in the [Offer to Purchase] that each defendant intended to sell as many shares as possible after the Tender Offer, it necessarily would have made stockholders more, not less, likely to tender shares."[37]

Although Chatham has stated a disclosure claim, its recourse appears to be limited if it can prove the claim, which is a much more difficult endeavor.[38] Our Supreme Court has made clear that compensatory damages for a disclosure claim are available only when a complaint pleads facts showing that "the damages [are] logically and reasonably related to the harm or injury for which compensation is

---

[36] *Dorchester Inv'rs v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 579 (S.D.N.Y. 2001) (applying "the Court's logic" in *Hunt, IRA v. Alliance N.A. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998)).

[37] Defs.' Reply Br. 12. *See also* Tr. 10 ("But there's nothing that says directors can't tender. Obviously, they have to make disclosure of that fact."), 17 ("As plaintiffs indicate, if the directors actually had a firm intent to sell . . . and they disclosed that, it would have made other stockholders more likely to tender. After all, if the insiders want out, that's a negative sign for the value of the company. Thus, more stockholders would have tendered.") (Aug. 8, 2017) (Dkt. 42).

[38] *See, e.g. Dorchester Inv'rs*, 134 F.Supp.2d at 579 ("[F]or Plaintiffs to prevail on this claim [that a disclosure was misleading because it stated a result as a possibility that in fact was a certainty], Plaintiffs must demonstrate that Defendants were *certain* that such a result would occur" when the disclosure was made.).

being awarded."[39]  Put differently, a failure to disclose material information will not provide a basis for compensatory damages "from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders on the information that was not disclosed, and (iii) damages proximately caused by that failure."[40]

Chatham's own allegations in the Amended Complaint suggest that it likely will be unable to establish reliance and causation to recover compensatory damages for its disclosure claim.  Chatham admits that, "because of the strict regulation of the percentage of total shares Chatham is permitted to hold, a limit that it was close to, Chatham would have to participate in the Tender Offer or face potential adverse regulatory consequences," and that Chatham had "no choice but to participate in the Tender Offer."[41]  Indeed, the central premise of the Amended Complaint is that Chatham did not want to sell any shares in the Tender Offer but

---

[39] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

[40] *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314-15 (Del. Ch. 2013); *see also O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 919 (Del. Ch. 1999) ("[C]ausation and actual quantifiable damages are elements of the *compensatory damages portion* of a claim for breach of the fiduciary duty of disclosure.") (emphasis in original); *In re Orchard Enter., Inc. S'holder Litig.*, 88 A.3d 1, 53 (Del. Ch. 2014) ("[A]lthough the request for stockholders to take action based on the disclosures may satisfy the requirement of reliance, the plaintiff still must prove causation and damages.").

[41] Am. Compl. ¶¶ 30, 57; *see also* Prayer for Relief ¶ 6 ("In the event that Chatham is forced to sell its shares, awarding Chatham damages to compensate it for the difference between the price of any such sale and the fair value of Chatham's shares.").

was forced to do so to comply with the 15% cap on its holdings imposed by the Rhode Island Department of Business Regulation. As such, it appears conceded that any harm Chatham suffered was caused not by its reliance on the disclosures in the Offer to Purchase, but by its need to comply with the 15% cap.

Given that Chatham's own allegations suggest that it likely will be unable to prove the elements necessary to sustain a disclosure claim for compensatory damages, the most it appears Chatham stands to gain from Count I of the Amended Complaint, if proven, is an award of nominal damages.[42] Our Supreme Court stated that "there must at least be an award of nominal damages" where "directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders."[43]

---

[42] "[N]ominal damages do not purport to put the offended party back in the place that it was before it suffered harm, rather they are 'in recognition of a technical injury and by way of declaring the rights of the plaintiff. Nominal damages are . . . selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.'" *SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *17 (Del. Ch. June 16, 2009) (quoting *Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC*, 2009 WL 1111179, at * 12 (Del. Ch. Apr. 27, 2009)); *see also Oliver v. Boston Univ.*, 2006 WL 1064169, at *35 (Del. Ch. Apr. 14, 2006) (awarding nominal damages "for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong" in a fiduciary duty case) (internal quotations omitted).

[43] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (Del. 1997) (explaining that *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del. 1993) "stands only for the narrow proposition that, where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must be at least an award of nominal damages"); *see also In re J.P.*

Here, Chatham has a reasonably conceivable claim for nominal damages because it alleges that it was forced to tender 35,954 shares of Twin River stock for $80 per share when the stock traded above $80 after the Tender Offer closed, thereby impairing its economic rights.[44]  If Chatham were to prevail on its disclosure claim, an award of nominal damages would serve the "purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong."[45]

### B.      Count II Fails to State a Claim for Relief

Count II of the Amended Complaint is an odd claim.  Chatham asserts that defendants breached their fiduciary duty of loyalty on the following theory:

> . . . the Defendants left Chatham no choice but to participate in the Tender Offer, while the Defendants, including the Director Defendants, abstained from participating themselves, and instead implemented a scheme to sell a significant portion of their shares into the market after the Tender Offer closed, at the higher price created by the Tender Offer.  Accordingly, the Defendants are attempting to bestow upon themselves benefits that were not offered to Chatham or other stockholders, namely the ability to sell shares without proration.[46]

---

*Morgan*, 906 A.2d at 773-74 ("[T]he plaintiffs' entitlement to seek nominal damages depends upon whether their complaint alleges the type of deprivation of the . . . stockholders' economic interests or impairment of their voting rights, that would be cognizable under *Tri-Star*, as limited by *Loudon*."); *In re Tyson Foods, Inc.*, 919 A.2d 563, 602 (Del. Ch. 2007) (noting that "nominal damages are appropriate only where the shareholder's economic or voting rights have been injured").

[44] Am. Compl. ¶¶ 27, 32.

[45] *Oliver*, 2006 WL 1064169, at *35 (internal quotations omitted).

[46] Am. Compl. ¶ 57; Pl. Answering Br. 21-22.

Chatham does not allege that any of the defendants sold any of their Twin River shares in the post-Tender Offer market or engaged in any other form of self-dealing. Chatham also concedes that nothing prevented Chatham from selling shares in the post-Tender Offer market.[47] If Chatham wanted to sell its shares in the post-Tender Offer market, it was free to do so. Thus, in addition to the lack of any allegations that defendants enriched themselves, Count II fails to explain how it is reasonably conceivable that Chatham was harmed in any way from an alleged scheme that was never implemented. Accordingly, Count II fails to state a claim for relief.[48]

## C. Count III Fails to State a Claim for Relief

In Count III of the Amended Complaint, Chatham asserts that defendants sent the April 7 Letter to the Regulators in bad faith. According to Chatham, "the false and deceptive content and timing of the April 7 letter support a reasonable

---

[47] Tr. 69-70 (Aug. 8, 2017) (Dkt. 42); Pl. Answering. Br. 22.

[48] *See Coates v. Netro-Corp.*, 2002 WL 31112340, at * 6 (Del. Ch. Sept. 11, 2002) (dismissing fiduciary duty claim challenging the adoption of a poison pill for failure to state a claim for relief because "the plaintiff fails to allege any specific threat or show any harm by the adoption of the poison pill rights plan").

inference that the Board mailed the letter with an actual intent to retaliate against Chatham for filing this lawsuit."[49]

"[T]o state a bad-faith claim, a plaintiff must show either an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties, or that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[50] "Bad faith is not a light pleading standard."[51]

Here, the Amended Complaint falls far short of pleading the "extreme set of facts" necessary to state a claim for bad faith with respect to the sending of the April 7 Letter. Chatham does not dispute that its institutional shareholder license requires that it "have (1) no involvement in [Twin River's] business activities and (2) no intention of influencing, affecting or participating in [Twin River's] affairs."[52] Nor does Chatham dispute that the Regulatory Agreement requires Twin River to take affirmative steps to monitor and ensure that a holder of 5% or more

---

[49] Pl.'s Answering Br. 25.

[50] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016) (internal quotation marks and citations omitted).

[51] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014).

[52] Defs.' Opening Br. Ex. A at 1.

of its shares complies with "all laws, statutes and rules and regulations."[53]

Chatham also failed to identify anything in the April 7 Letter that was false.[54]

Finally, the timing of the April 7 Letter's submission is not inherently suspicious, given that it refers to events that occurred in February 2017 (the filing of this action) and in early April 2017 (an investor call) as two of the four points that formed the basis for Twin River's stated concerns about Chatham's activities.[55]

Under these circumstances, and given Twin River's exposure to significant penalties for not adhering to its obligations under the Regulatory Agreement, it is not reasonably conceivable in my opinion that the decision to send the April 7 Letter reflects an intentional disregard of defendants' fiduciary duties or is so far beyond the bounds of reasonable judgment that it is essentially inexplicable on any ground other than bad faith. Given my conclusion that Chatham has failed to state a reasonably conceivable claim of bad faith, I do not address the parties' arguments concerning the Noerr-Pennington doctrine.

---

[53] Defs.' Opening Br. Ex. E § 7.1.

[54] Chatham alleged that the April 7 Letter "falsely reported . . . that the instant suit was an effort 'to pressure for liquidity disguised as a lawsuit.'" Am. Compl. ¶ 38. This allegation cropped an important qualification from the April 7 Letter, however, which actually states that "it *may* be that the litigation is really the renewal of Chatham's efforts to pressure for liquidity disguised as a lawsuit." Defs.' Opening Br. Ex. A at 2 (emphasis added).

[55] Defs.' Opening Br. Ex. A.

* * * * *

For the reasons explained above, defendants' motion to dismiss is denied

with respect to Count I and granted with respect to Counts II and III.

IT IS SO ORDERED.

Sincerely,

*/s/ Andre G. Bouchard*

Chancellor

AGB/ms